J-S30032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.E.B., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.B., FATHER | : : : : : : | |
| | : | No. 1293 EDA 2022 |

Appeal from the Decree Entered May 5, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000737-2021

BEFORE: STABILE, J., McCAFFERY, J., and PELLEGRINI, J.*

MEMORANDUM BY PELLEGRINI, J.:                    **FILED SEPTEMBER 15, 2022**

E.B. (Father) appeals from the decree entered in the Court of Common Pleas of Philadelphia County Juvenile Division (trial court) granting the petition of the Philadelphia Department of Human Services (DHS) to involuntarily terminate his parental rights to M.E.B. (d/o/b October 2020) (Child) pursuant to the Adoption Act, 23 Pa.C.S. § 2511 (a)(1), (2), (5), (8) and (b), and changing her permanency goal to adoption.[1]  Counsel has filed an application to withdraw and a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967).  We affirm the decree and grant counsel's application.

_____

* Retired Senior Judge assigned to the Superior Court.

[1] The trial court also involuntarily terminated the parental rights of Child's mother, K.C.S. (Mother) on May 5, 2022.  She has not appealed.

We take the following factual background and procedural history from the trial court's June 15, 2022 opinion and our independent review.

**I.**

**A.**

On September 4, 2020, Father suffered a gunshot wound to his face and was hospitalized until around the time of Child's birth in October 2020. (**See** N.T. Hearing, 5/05/22, at 39).

On October 30, 2020, DHS received a General Protective Services (GPS) report alleging that Mother tested positive for benzodiazepine, cocaine, amphetamines, opiates, marijuana and suboxone when Child was born at Temple University Hospital (TUH) in October 2020. Child tested positive for cocaine and amphetamines. Father was not listed on Child's birth certificate but is her putative/natural/ presumptive father. (**See** Petition for Involuntary Termination of Parental Rights, 12/06/21, at 1).

Mother left TUH against medical advice, leaving behind Child, who was under observation for withdrawal symptoms. On November 3, 2020, Child was ready to be discharged from TUH, but her parents' whereabouts were unknown despite DHS's attempts to find them. DHS obtained an order of protective custody (OPC) the same day. Child was placed in a foster care home through Bethanna, where she has remained throughout the life of this case. (**See id.** at Exhibit A, Statement of Facts, at ¶¶ c-f).

At the November 4, 2020 shelter care hearing, the OPC was lifted and temporary commitment ordered to stand, with legal custody transferring to DHS and continued foster care placement through Bethanna. (*See id.* at ¶ g).

DHS met with Father on November 14, 2020. He stated he was transient, occasionally residing with his mother at 2420 West Sergeant Street, Philadelphia. On November 25, 2020, an initial single case plan (SCP) was created. Father's objectives were to obtain safe housing for his family, keep all scheduled visits with Child, participate in a Clinical Education Unit (CEU) drug and alcohol assessment and follow any recommendations. (*See id.* at ¶¶ h, i).

On November 27, 2020, DHS filed a dependency petition and determined there was a sufficient basis to find aggravated circumstances existed because Mother's parental rights to two of her other children had been involuntarily terminated on December 2, 2009, and August 11, 2011. Counsel was appointed to represent Father on December 10, 2020. (*See id.* at ¶¶ j, k).

A December 31, 2020 adjudicatory hearing was held, with adjudication deferred. Child remained in foster care. The court ordered virtual, supervised visitation and, due to Father's outburst, the next hearing was ordered to be virtual. (*See id.* at ¶ l).

A February 24, 2021 adjudicatory hearing was held at which Father was present and Child was adjudicated dependent. Legal custody remained with

DHS and Child continued her foster care placement. (*See id.* at 38). The court referred Father immediately to the CEU for a drug and alcohol screen and substance abuse assessment. He was permitted to participate in virtual visits with Child and ordered to confirm visits twenty-four hours in advance and on the scheduled visit day. The Community Umbrella Agency (CUA) was to sign for early intervention services and Father was referred to the Achieving Reunification Center (ARC) to obtain appropriate services. (*See id.* at ¶ m).

Father was incarcerated from April 2021 until December 2021.

On May 13, 2021, a permanency review hearing was held at which the court learned of Father's incarceration. It ordered Father to attend weekly supervised visits with Child at the agency upon release from prison. The CUA was to make outreach to Father and to sign for routine medical, dental and therapy for Child. Father was referred to the CEU upon release from incarceration for a drug and alcohol evaluation, dual diagnosis assessment and monitoring and to ARC for parenting, employment and housing services. (*See id.* at ¶ o).

A revised SCP was created on May 20, 2021. Father's objectives were to obtain safe housing for his family, keep all scheduled visits with Child, make his whereabouts known and provide an accurate address to the CUA when he was released from prison and participate in CEU assessment and adhere to all recommendations. (*See id.* at ¶ p).

A permanency review hearing was held on September 23, 2021. Supervised visits at the agency were ordered after Father's prison release, with Father to confirm the visits twenty-four hours before their scheduled time. Father was again referred to the CEU upon release from prison for a full drug and alcohol screen, dual diagnosis assessment, monitoring, and three random drug and alcohol screens before the next court date. The court also ordered Father referred to ARC for parenting, housing and employment programs/services upon release. A parent locator search was conducted for Father and the CUA was permitted to sign all appropriate forms for Child's routine medical and dental care. (*See id.* at ¶ q).

On December 6, 2021, DHS filed a petition to involuntarily terminate Father's rights to Child for his failure to comply with the SCP objectives or maintain regular visitation with Child. A status review hearing was held on December 21, 2021. Father was referred to CEU forthwith for full drug and alcohol screen, dual diagnosis assessment, monitoring and three random screens before the next court date.

On March 4, 2022, Father was incarcerated on a drug charge for a period of ninety days.

**B.**

A contested termination of parental rights hearing was held on May 5, 2022. CUA caseworker Tamika Palmer testified on behalf of DHS and Father testified on his own behalf.

**1.**

Ms. Palmer testified that Child was placed in foster care immediately after her birth and she has remained in the same pre-adoptive foster home her entire approximately eighteen-month life. (**See** N.T. Hearing, 5/05/22, at 10, 16).

Ms. Palmer testified that there were substance abuse concerns related to Father. His objectives remained the same throughout the life of the case, namely, complete drug and alcohol treatment, obtain housing, secure employment, regularly attend mental health counseling and appear for visitation with Child. (**See id.** at 17-20, 35-37). Father did not comply with any objectives or participate in any court-ordered services; specifically failing to get "an assessment, random, or any sort of screen" at the CEU, attend ARC, or obtain stable housing during the periods he was not incarcerated. (**See id.** at 18-19). Although he attended a few visits upon Child's initial placement in foster care, he had not visited with Child for over one year as of the date of the May 5, 2022 hearing. (**See** N.T. Hearing, 5/05/22, at 20). Ms. Palmer made outreach to Father at the prison via certified mail and telephone, but he did not respond to her efforts. (**See id.** at 18, 31).

Ms. Palmer explained that Child looks to foster parents for all her needs. Child has developmental concerns, including gross motor delay and speech delay and St. Christopher's wants to explore if she has cerebral palsy. (**See id.** at 21-22). The foster parents work well with Child's service providers and

have met all Child's medical needs. They take her to her appointments and participate in any follow-up, including Child's services for speech, PT and reading therapy and sign language instruction at ChildLink. (*See id.* at 22-23). Child is current on routine medical care, and Ms. Palmer said that she saw Child virtually at the foster home on May 4, 2022, and that she was safe and all her needs were met. (*See id.* at 21). Ms. Palmer stated that there is no child-parent bond between Father and Child because there has been no contact or involvement and he has failed to meet her needs. It was her opinion that Child would not suffer any irreparable harm if Father's parental rights were terminated and Child's goal changed to adoption. (*See id.* at 20-24). The court found Ms. Palmer's testimony credible.

**2.**

Father testified that he was shot on September 4, 2020, and released from the hospital in October 2020. (*See id.* at 39). He was then incarcerated from April 2021 until December 14, 2021, and arrested again on March 4, 2022, for a drug charge. (*See id.* at 35, 41, 43). He stated that he was in contact with a former CUA caseworker, Keisha, when Child was first placed in foster care, but that she did not inform him that he was to obtain services. (*See id.* at 38-39). He admitted that he did not engage in a drug and alcohol program in the approximately five months between when Child went into foster care in November 2020 and when he was arrested in April 2021. (*See id.* at 40). Although Father admitted that he was present at the February

2021 adjudicatory hearing and that he understood Child was in custody, he claimed that he was unaware that the court had ordered him to go to a program, obtain housing or provide random drug screens, and that no one from the CUA ever contacted him when he was in prison. (*See id.* at 38, 40-41, 43-44). Father maintained that while he was incarcerated in 2022 for the drug charge, he signed up for parenting classes and a drug program but had not participated in them yet. (*See id.* at 35-36).

From November 2020 until his April 2021 incarceration, Father went back and forth between his mother's house and his own boarding house room. (*See id.* at 39). During the period of December 2021 until March 2022, Father lived in a room at a residence on Hope Street. (*See id.* at 36-37, 41). He stated that he did not work in 2020 or 2021, but that he was getting pandemic unemployment. (*See id.* at 41).

Father agreed that he wants custody of Child. When his counsel asked why Father thought he would be able to care for her, he responded that at this time he is "going through [his] situation," but people make mistakes. *Id.* at 44). Although he stated that Child is "in a good place," he said he intended to do what he needs to do to be reunified with her. (*Id.* at 44).

At the conclusion of the hearing, the court granted DHS's petition and entered a decree involuntarily terminating the parental rights of Father pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2) and (b). (*See* Decree of Involuntary Termination of Parental Rights, 5/05/22, at 1). Father timely

appealed and filed a contemporaneous statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i). Counsel filed an *Anders* application to withdraw as counsel.

## II.

### A.

Before reaching the merits of Father's issues, we must first address whether counsel has properly sought to withdraw from this appeal. In *In re V.E.*, 611 A.2d 1267 (Pa. Super. 1992), this Court extended *Anders* to appeals involving the termination of parental rights. *See id.* at 1275. In such cases, counsel representing a parent on a first appeal from a decree involuntarily terminating parental rights may petition for leave to withdraw representation and submit an *Anders* brief. *In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004). Counsel must: 1) petition the court for leave to withdraw, stating that after making a conscientious examination of the record, she has determined that the appeal would be frivolous; 2) furnish a copy of the brief to the defendant; and 3) advise the defendant that he has the right to retain private counsel or raise additional arguments that he deems worthy of the court's attention. *See Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013). We also review counsel's *Anders* brief for compliance with the requirements under *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009), which require the *Anders* brief to provide a summary of the procedural history and facts, with citations in the record; refer to

anything that might support the appeal; and include counsel's conclusion that the appeal is frivolous and the reasons supporting such decision. **See Santiago**, **supra** at 361.

Counsel has complied with these requirements. The application to withdraw as counsel states that she has reviewed the record and concluded that the appeal is frivolous. (**See** Application to Withdraw as Counsel, 7/19/22, at 1). Counsel certifies that she sent a copy of the **Anders** brief and petition to withdraw to Father. Additionally, counsel's letter advises Father of his right to retain private counsel or raise *pro se* any additional arguments he would like this Court to consider. The **Anders** brief also complies with the **Santiago** requirements. Thus, we will conduct an independent review of the record to discern if there are any non-frivolous issues that counsel may have, intentionally or mistakenly, omitted or misstated. **See Commonwealth v. Yorgey**, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*).

**B.**

Father challenges the trial court's termination of his parental rights to Child and the goal change to adoption.[2] He claims that his rights should not

---

[2] Our standard of review of this matter is well-settled:

> … [I]n termination of parental rights cases [we are required] to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision

*(Footnote Continued Next Page)*

- 10 -

have been terminated where he was not properly informed of his objectives or offered services by DHS to complete them. (**See Anders** Brief, at 5). He also asserts that he was not given the opportunity to establish a strong emotional and physical bond with Child because he was not offered visits. (**See id.** at 5).

> … Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.
>
> To affirm a termination decree, we must agree with the trial court as to any one subsection of Section 2511(a).

**Interest of S.S.**, 252 A.3d at 685–86 (citations omitted).

"The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for

_____

> may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

**Interest of S.S.**, 252 A.3d 681, 685 (Pa. Super. 2021) (citations omitted).

termination delineated in the relevant subsections of Section 2511(a)." ***See***

***Interest of A.M.***, 256 A.3d 1263, 1270 (Pa. Super. 2021) (brackets and

citation omitted). Instantly, the trial court terminated Father's rights pursuant

to Sections 2511(a)(1), (2), and (b). Because we need only agree with one

subsection of 2511(a), as well as subsection (b), to affirm the decree, we

proceed to our analysis of subsection (a)(1), which provides that termination

is proper if:

> The parent by conduct continuing for a period of at least six
> months immediately preceding the filing of the petition either has
> evidenced a settled purpose of relinquishing parental claim to a
> child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

"A court may terminate parental rights under Section 2511(a)(1) where

the parent demonstrates a settled purpose to relinquish parental claim to a

child or fails to perform parental duties for at least the six months prior to the

filing of the termination petition." ***In re K.Z.S.***, 946 A.2d 753, 758 (Pa. Super.

2008) (citation omitted). Although Section (a)(1) of the statute focuses on

the six months immediately preceding the filing of the petition, the court must

consider the whole history of a given case and may consider a parent's inaction

before the six-month statutory provision. ***See id.*** "[W]here a child is in foster

care, a parent has the affirmative duty to work towards the return of the child

by cooperating with the Agency to obtain the rehabilitative services necessary

for [him] to be capable of performing [his] parental duties and

- 12 -

responsibilities." ***In the Interest of T.M.W.***, 232 A.3d 937, 949 (Pa. Super. 2020).

A parent's responsibilities are not tolled during his incarceration. ***See In re Adoption of S.P.***, 47 A.3d 817, 828 (Pa. 2012). Rather, we must inquire whether the parent has used those resources at his disposal while in prison in continuing a close relationship with the child. ***See id.*** "Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited." ***Id.*** (citation omitted).

Instantly, the trial court explains:

> This Child has been in placement since her birth when she tested positive for cocaine and amphetamines and later released from Temple University Hospital directly to the pre-adoptive foster care parents. This was in November of 2020 and the evidence is clear and convincing and uncontradicted that Father was not involved with this Child. Father testified he had some involvement in the early parts of this case. [H]owever, there is no evidence that the Child has a relationship nor a bond with Father. This court resolves any conflict in credibility and issues presented in testimony in favor of [DHS], whose witnesses were more credible, and have had the ability to observe and monitor this case.

> The record shows that [Child] has never been in Father's care nor has any evidence been presented that she is aware of who her Father is. Father has failed to remedy any of the issues that brought this Child into [c]ourt, and this Child's life cannot be placed on hold in the hope that Father will summon the ability to handle the responsibilities of parenting.

> Father failed to provide any evidence that he has utilized whatever resources were available to him in prison in order to foster a continuing close relationship with this Child. Father has failed to articulate a plan as to housing for the Child and his employment following release. An incarcerated parent desiring to retain parental rights must exert himself or herself to take and maintain a place of importance in the child's life. The record

- 13 -

reflects that Father has failed to provide evidence of any attempt to retain his rights to this Child. Therefore, this [c]ourt finds DHS has provided clear and convincing evidence that the best interest, needs and welfare of this Child would best be served by the termination of Father's parental rights ….

(Trial Court Opinion, 6/15/22, at 15-16).

The record supports the trial court's determination that there is clear and convincing evidence that termination is appropriate. Ms. Palmer's testimony showed that Father failed to perform any parental duties or maintain contact with DHS for a period of at least six months before the hearing because he has failed to complete any SCP objectives or remedy the issues that brought Child into care. (*See* N.T., 5/05/22, at 17-19). As the caseworker confirmed, although Father was in and out of prison, he was aware of the objectives that he obtain housing, engage in supervised visits with Child, submit random drug screens and complete CEU requirements because she had reached out to him in prison and informed him of the treatment plan and he attended the February 24, 2021 adjudicatory hearing when the court ordered the Father to meet the objectives. (*See id.* at 17-18).

In fact, Father admitted he knew Child was in custody because he participated in the adjudicatory hearing and had initially communicated with a CUA caseworker. A review of the record confirms that the trial court ordered Father to the CEU for a drug and alcohol screen and substance abuse assessment, to participate in virtual visits with Child and avail himself of all appropriate services at ARC. He confirmed that he did not engage in any drug

and alcohol programs from the time Child came into care in November 2020 until he was incarcerated in 2021, or between his December 2021 release and March 2022 incarceration. (*See id.* at 37-40). Although he maintained that CUA caseworkers did not give him any referrals for drug and alcohol or housing programs, and that he was unaware he had to submit random drug screens, the court found DHS's contrary testimony to be credible. (*See id.* at 38, 40, 41); (*see* Trial Ct. Op., at 15). Father testified that although there were periods during this case that he was not incarcerated, he failed to obtain employment or appropriate housing. (*See id.* at 41-43). He claimed that he signed up for parenting classes and a drug program, but neither had started by the time of the TPR hearing. (*See id.* at 35-37).

Based on the foregoing, the trial court had clear and convincing evidence that Father has "evidenced a settled purpose of relinquishing [his] parental claim to [Child]" and "has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Thus, the trial court did not err or abuse its discretion when it terminated Father's parental rights pursuant to Subsection (a)(1).

## C.

Having concluded that the grounds for termination have been met under subsection (a), we must give primary consideration to subsection (b) and "the developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S. § 2511(b).[3]

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. ... While a parent's emotional bond with his or her child is a major aspect of ... [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

**Interest of A.M.**, 256 A.3d at 1272 (citation omitted).  When evaluating a parental bond, the court may rely on the evaluations of social workers and caseworkers.  **See In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010).

> Moreover, common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster

_____

[3] Subsection 2511(b) provides:

> **(b) Other considerations.–**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

parents. The court may consider intangibles such as the love, comfort, security and stability the child might have with the foster parent. Ultimately, the concern is the needs and welfare of the child.

*Interest of A.M.*, 256 A.3d at 1272 (citations, brackets and quotation marks omitted).

At the termination hearing, Ms. Palmer testified that Child has medical and developmental concerns and that her pre-adoptive foster parents are working well with the service providers and are meeting all Child's needs. Furthermore, Child has a bond with her foster parents, whom she has been with since birth. (*See* N.T., 5/05/22, at 16-17, 21-24). The caseworker testified that Child would not suffer any irreparable harm if Father's parental rights were terminated since there is no father-child bond where eighteen-month-old Child has not seen Father in over a year. (*See id.* at 20-21, 23-24). Our review of the record supports this assessment, as there is no evidence of any bond with Father, while foster parents, a pre-adoptive resource since Child's birth, have met all her vast needs. Thus, the record supports the trial court's conclusion that Child's developmental, physical and emotional needs are best met by terminating Father's parental rights. Because the trial court's conclusion is supported by competent record evidence, we discern no error or abuse of discretion in its determination of subsection (b).

Finally, our independent examination of the certified record did not reveal any additional, non-frivolous issues overlooked by counsel, and we

agree with Father's counsel that this appeal is frivolous. ***See Yorgey***, 188 A.3d at 1197. As a result, we grant counsel's application to withdraw from representation and affirm the decree terminating Father's parental rights to Child.

Application to withdraw granted. Decree affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 9/15/2022*